**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| WORLD WRESTLING ENTERTAINMENT, INC., | |
| Plaintiff | Case No. 6:17-cv-504-ORL-40-GJK |
| vs. | |
| DEGESREE ROOPNARINE GIBBS, MARY NADINE MODARELLI, STEVE EDWARD WRIGHT, DONALD THOMAS SIMON, JOHN AND JANE DOES 1-100, And XYZ CORPORATIONS 1-100, | |
| Defendants. | |

## AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL

Plaintiff World Wrestling Entertainment, Inc. ("WWE"), by and through its undersigned attorneys, hereby files this Amended Complaint to provide the identities of those individuals who WWE was able to serve pursuant to the Court's March 23, 2017 Temporary Restraining Order and Order for Seizure of Counterfeit Marked Goods (the "March 23, 2017 Order") and from whom counterfeit WWE merchandise was seized during WWE's WrestleMania® 33 weekend in Orlando, Florida from March 30 through April 4, 2017. In support of this Amended Complaint, WWE alleges as follows:

## NATURE OF THE CASE

1.      This is an action for trademark infringement, counterfeiting and dilution under the Lanham Act, 15 U.S.C. § 1051, *et seq.*, including the Trademark Counterfeiting Act of 1984, 15 U.S.C. § 1116(d), and related state law claims for trademark infringement, dilution and unfair competition occasioned by Defendants' unlawful manufacture, distribution and/or sale of

1

counterfeit merchandise bearing unauthorized copies of WWE's registered and unregistered trademarks and service marks. WWE brings this action to (i) protect its reputation for selling merchandise of the highest quality and grade; (ii) prevent deception of the consuming public by Defendants; (iii) retain control over the substantial goodwill associated with the numerous registered and unregistered trademarks and service marks being unlawfully exploited by Defendants; and (iv) avoid thousands of irretrievably lost sales.

2.     To achieve these goals, WWE, through an *Ex Parte* Motion for Temporary Restraining Order; Order for Seizure of Counterfeit Marked Goods; and Order to Show Cause Why a Preliminary Injunction Should Not Issue, sought and obtained an order from this Court authorizing the seizure of WWE counterfeit merchandise.

3.     WWE also seeks a preliminary and permanent injunction barring Defendants from unlawfully infringing WWE's intellectual property rights through Defendants' manufacture, distribution and/or sale of counterfeit merchandise bearing any of WWE's registered or unregistered marks, the names or likenesses of its wrestlers, or any other word, name, or design that is likely to cause confusion or mistake or to deceive during WWE's nationwide tour of live wrestling entertainment events which began in Orlando, Florida on March 30, 2017 with WWE's WrestleMania® 33 weekend and ends March 27, 2018 (WWE's final live event before WrestleMania® 34) ("WWE's 2017-2018 Live Events"). WWE's WrestleMania® 33 weekend consisted of various events taking place in Orlando, Florida from March 30 through April 4, 2017, including, but not limited to, (1) WWE's WrestleMania® Axxess event at the Orange County Convention Center from March 30 through April 2, 2017; (2) WWE's WrestleMania® Hall of Fame Induction Ceremony event at the Amway Center on March 31; (3) WWE's NXT® TakeOver event at the Amway Center on April 1; (4) WWE's WrestleMania® 33 event at the

Orlando Citrus Bowl (a/k/a Camping World Stadium) on April 2; (5) WWE's Monday Night Raw® event at the Amway Center on April 3; and (6) WWE's Smackdown® Live event on April 4 at the Amway Center (collectively, the "WrestleMania® 33 Weekend Events").

## PARTIES

4.      Plaintiff WWE is a Delaware corporation having its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902.

5.      Defendant Degesree Roopnarine Gibbs is an individual who, upon information and belief, has a mailing address of P.O. Box 2454, Alachua, Florida 32616-2454.  Pursuant to the Court's March 27, 2017 Order, Ms. Gibbs was served with a copy of the Verified Complaint, Summons and March 27, 2107 Order on March 31, 2017 and WWE seized 19 counterfeit black hats bearing WWE's trademarks.  Ms. Gibbs was served a second time on April 2, 2017 and WWE seized another 3 counterfeit black hats bearing WWE's trademarks.  Upon information and belief, Ms. Gibbs has acted and will act in concert or active participation with the other named and unnamed Defendants (and their officers, agents, servants and employees) in the action in connection with a counterfeiting ring and the wrongful act alleged below.

6.      Defendant Mary Nadine Modarelli is an individual who, upon information and belief, has an address of 4830 NW 43rd St., Apt. F96, Gainesville, Florida 32606-4497. Pursuant to the Court's March 27, 2017 Order, Ms. Modarelli was served with a copy of the Verified Complaint, Summons and March 27, 2107 Order on March 31, 2017 and WWE seized 20 counterfeit black hats bearing WWE's trademarks.  Ms. Modarelli was working with Ms. Gibbs.  Ms. Modarelli was served a second time on April 2, 2017 and WWE seized another 141 counterfeit hats bearing WWE's trademarks.  Upon information and belief, Ms. Modarelli has acted and will act in concert or active participation with the other named and unnamed

Defendants (and their officers, agents, servants and employees) in the action in connection with a counterfeiting ring and the wrongful act alleged below.

7.     Defendant Steve Edward Wright is an individual who, upon information and belief, has an address of 1205 Ryan St., Clermont, Florida 34711-3047.  Pursuant to the Court's March 27, 2017 Order, Mr. Wright was served with a copy of the Verified Complaint, Summons and March 27, 2107 Order on April 2, 2017 and WWE seized 31 counterfeit t-shirts (11 colors and 2 styles) bearing WWE's trademarks.  Upon information and belief, Mr. Wright has acted and will act in concert or active participation with the other named and unnamed Defendants (and their officers, agents, servants and employees) in the action in connection with a counterfeiting ring and the wrongful act alleged below.

8.     Defendant Donald Thomas Simon is an individual who, upon information and belief, has an address of 363 Pinecrest Rd., Canton, Georgia 30115-9036.  Pursuant to the Court's March 27, 2017 Order, Mr. Wright was served with a copy of the Verified Complaint, Summons and March 27, 2107 Order on April 3, 2017 and WWE seized 23 counterfeit t-shirts bearing WWE's trademarks.  Upon information and belief, Mr. Wright has acted and will act in concert or active participation with the other named and unnamed Defendants (and their officers, agents, servants and employees) in the action in connection with a counterfeiting ring and the wrongful act alleged below.  Indeed, hours before WWE seized the counterfeit shirts from Mr. Simon, WWE encountered the identical counterfeit t-shirt that Mr. Simon was selling in a different location.  This John Doe refused service and would not provide his name or any contact information but voluntarily relinquished his counterfeit merchandise to WWE.

9.     Defendants John and Jane Does and XYZ Corporations, whose precise identities are not yet known to WWE, are individuals and entities who, upon information and belief, have

4

been doing business, continue to do business, or will be doing business in the Middle District of Florida, or are now conspiring and otherwise will be traveling to WWE's 2017-2018 Live Events at the other states listed in Exhibit 3 attached hereto.

10.     Upon information and belief, all Defendants are acting in concert and active participation with each other in connection with the wrongful acts alleged below.

## JURISDICTION AND VENUE

11.     This Court has personal jurisdiction over the Defendants because they reside in and/or have transacted or will be transacting business in this State, and have caused harm or tortious injury in this State by acts within this State.  Upon information and belief, Defendants are individuals and entities who will be present in the Middle District of Florida in connection with the claims asserted below and/or who, at all times relevant hereto, have done business, continue to do business, or will be transacting business in the Middle District of Florida.

12.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a) and (b).  This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), with respect to the state law claims asserted herein.

13.     This Court is an appropriate venue for this action under 28 U.S.C. § 1391(a)(2), because a substantial part of the events giving rise to WWE's request for relief will occur in this district.

## FACTUAL BACKGROUND

A.     **WWE's Business And Marks**

14.     Since at least as early as February 1983, WWE, first doing business as the "World Wrestling Federation" and now doing business as "World Wrestling Entertainment," has provided to the public live and televised wrestling and entertainment events and services (the "WWE Wrestling Services") under the service marks WORLD WRESTLING

ENTERTAINMENT®, WWE®, and the WWE logo®.  WWE also exclusively owns or controls

all right, title and interest in the names, likenesses and rights of publicity for its current wrestlers.

In connection therewith, WWE has used, advertised, publicized and presented the WWE

Wrestling Services, and related souvenirs, merchandise and other products ("WWE

Merchandise") under the WORLD WRESTLING ENTERTAINMENT® mark and certain other

service marks and trademarks (collectively, the "WWE Marks").   A listing of those WWE

Marks, both currently pending or registered with the United States Patent and Trademark Office

and unregistered but exclusively owned or controlled by WWE, is set forth in Exhibits 1 and 2

hereto, respectively.  Among the marks most important to this action are:

| Mark | U.S. Trademark Registration Nos. |
|---|---|
| WORLD WRESTLING ENTERTAINMENT | 2,818,358; 2,772,677; 2,757,599; 2,754,499; 2,870,426; 2,902,203; 2,917,910; 3,585,170; 3,585,171 |
| WWE | 2,772,683; 3,056,074; 3,541,936; 4,451,697; 3,538,710; 3,489,357; 3,412,176; 3,412,177; 3,541,956; 3,621,017 |
| WWE Logos | 4,735,547; 4,731,795; 4,735,546; 4,625,255; 4,727,923; 4,675,657; 4,538,209; 4,689,839; 4,689,835; 4,538,210; 4,614,144; 4,645,471; 4,552,144; 2,757,596; 2,754,495; 2,846,450; 2,799,228; 2,751,436; 2,757,597; 2,765,751; 2,751,437; 4,756,090; 3,412,169; 3,412,170; 3,691,588; 4,220,594; 86/139,905 |
| WRESTLEMANIA | 1,432,884; 1,863,534; 2,625,125; 2,881,508; 3,351,858; 3,351,859; 3,727,338; 3,727,339; 4,285,112; 4,780,778; 4,923,842; 5,094,698 |

The WWE Marks are well known to the public and have come to identify WWE to the public as

the genuine source and sponsor of WWE Wrestling Services and WWE Merchandise.

15.    WWE's 2017-2018 Live Events are a multi-city presentation of live wrestling

entertainment events throughout the United States and in many other cities throughout the world.

The tentative itinerary of WWE's 2017-2018 Live Events is attached hereto as Exhibit 3.  Most

major U.S. cities will have a WWE live event appear in their city at least once or twice a year. WWE's 2017-2018 Live Events include all of the following types of programs: (1) live, pay-per-view events; (2) live, nationally televised and/or internet streamed shows; and (3) live, non-televised events known as "house shows." In addition to generating revenues through ticket sales, promoting its pay-per-view events and subscriptions to WWE's internet streaming service known as WWE Network, WWE sells a significant portion of WWE Merchandise at its Live Events.

16.    WWE typically presents twelve (12) to sixteen (16) WORLD WRESTLING ENTERTAINMENT® pay-per-view events per year. WWE's annual marquee pay-per-view event is called "WrestleMania®" which sells for at least $59.99 per view through WWE's cable providers and is offered to subscribers of the WWE Network. WrestleMania® is considered one of the "Big Four" original annual WWE pay-per-view events, along with SummerSlam®, Royal Rumble® and Survivor Series®.

17.    WWE's pay-per-view events are the biggest wrestling events of the year for WWE and offer an occasion for, *inter alia*, determining and crowning WWE's various champions and/or elucidating the various story lines developed by WWE throughout the year. These live pay-per-view events are extensively promoted and widely attended and viewed.

18.    For example, the first WrestleMania®, WrestleMania® 1, was held March 31, 1985, at Madison Square Garden in New York City. Subsequent WrestleMania®'s have occurred in such sites as the Pontiac Silverdome in Pontiac, Michigan (WrestleMania® 3), which drew over 90,000 spectators; Atlantic City, New Jersey (WrestleMania®'s 4 and 5); and Indianapolis, Indiana (WrestleMania® 8). The 2010 and 2011 WrestleMania®'s (WrestleMania® 26 and 27) drew over 70,000 spectators at University of Phoenix Stadium in Glendale, Arizona

and the Georgia Dome in Atlanta, Georgia and over 890,000 pay-per-view customers and one million pay-per-view customers, respectively. WrestleMania® 30 at the Mercedes-Benz Superdome in New Orleans, Louisiana drew a sold-out crowd of 75,167 spectators from all 50 states as well as 36 foreign countries, and was watched by more than one million households in the United States through pay-per-view or the WWE Network. WrestleMania® 31 at Levi's Stadium in Santa Clara, California drew over 76,000 spectators from all 50 states and 40 countries, and over 1.3 million subscribers through pay-per-view or the WWE Network. Last year's WrestleMania® 32 occurred at AT&T Stadium in Arlington, Texas drew a crowd of 101,763 from all 50 states and 35 countries, and was viewed by 1.82 million subscribers through the WWE Network alone. Moreover, WrestleMania® 32 was mentioned 2.5 million times on Twitter during the day of the broadcast.

19.     WWE's WrestleMania® event also has drawn record merchandise sales for the venues. For example, WrestleMania® 30 grossed $10.9 million, making it the highest grossing entertainment event in the history of the Mercedes-Benz Superdome. Last year, WrestleMania® 32 grossed $17.3 million, making it the highest grossing live event in WWE history. WrestleMania® 32 also generated a record-breaking $4.55 million in WrestleMania® merchandise revenue, an increase of 37 percent, or $1.2 million, from WrestleMania® 31.

20.     In addition to its pay-per-view events, WWE currently presents three weekly WWE programs called "RAW®," "Smackdown®," and "Total Divas!" that feature wrestling entertainment programming every Monday and Tuesday night nationwide on the USA Network cable television channel and Wednesday nights on the E! Network respectively. WWE also provides WWE Network subscribers with access to a massive and continuously growing video library that includes, among other things, live streamed original programming, including "WWE

NXT®,” and pay-per-view events, as well as “on demand” prior pay-per-view and televised events.  WWE also syndicates its video content on Hulu and YouTube including full length episodes and clips of “RAW®,” “Smackdown®” and a variety of classic content and original short-form webisodes.

21.    At its Live Events, in retail stores nationwide and via on-line, WWE sells a large variety of WWE Merchandise featuring the WWE Marks.  The WWE Merchandise typically displays prominently the name and logos of the company, the WWE Marks, its events, its programs, and/or the wrestlers and other personalities involved with the events and programs. Examples of WWE Merchandise include, without limitation, T-shirts, jerseys, sweatshirts, caps, hats, belts, wrestling face masks, sunglasses, key rings, action figures, posters, and DVDs.

**B.     Counterfeiting At Previous Live Events**

22.    For many years, WWE has sold the WWE Merchandise at and in connection with its Live Events.  WWE’s venue merchandise business consists of the design, sourcing, marketing and distribution of numerous WWE-branded products, such as t-shirts, caps and other novelty items, all of which feature WWE’s Superstars, Divas and/or logos, including WORLD WRESTLING ENTERTAINMENT®, WWE®, the WWE® logos, and/or one or a number of other WWE Marks included in Exhibits 1 and 2 hereto.  In 2016, 2015 and 2014, venue merchandise net revenues were $24.2 million, $22.4 million, and $19.3 million, respectively, and represented approximately 3-5% of WWE’s total net revenues for each year.

23.    WWE Merchandise is of the highest quality and grade.  These genuine goods are currently being sold only at authorized brick and mortar locations throughout the United States including, but not limited to, the house show arenas and live event venues, and retail stores in the Middle District of Florida, as well as authorized online retail stores such as WWE’s e-commerce website at www.wweshop.com.

9

24.     Based upon information and belief, WWE's past experiences, and its investigation into the matter, WWE has learned that Defendants, alone and in conjunction with other, similarly situated individuals and entities, specifically numerous peddlers and manufacturing and distribution companies, will be attempting to sell or distribute goods of inferior quality to those sold, or licensed for sale, by WWE at or near WWE's 2017-2018 Live Events.  These goods, which are marked with imitations or counterfeits of the WWE Marks, include, *inter alia*, T-shirts, sweatshirts, caps, wrestling face masks, DVDs, posters, and other souvenirs, merchandise and memorabilia ("Counterfeit Merchandise").  In addition, the merchandise sold by Defendants not only is counterfeit but the merchandise also threatens public safety.  Based on past experience, there are concerns about the quality of the counterfeit goods, such as the flammability level of the ink used to print the t-shirts, and the safety of the design of other goods, including wrestling face masks.

25.     For example, at WWE's WrestleMania® 27 weekend events, held March 30 – April 4, 2011, in Atlanta, Georgia, WWE encountered an untold number of individuals, who came from all over the United States, distributing and selling Counterfeit Merchandise.  With the aid of an *ex parte* TRO and seizure order granted by the United States District Court for the Northern District of Georgia, WWE was able to gain some measure of control over such counterfeiting by seizing more than 3,000 counterfeit t-shirts during the WrestleMania® 27 weekend events.  The t-shirts were being sold for at least $10 per shirt.

26.     At the WrestleMania® 28 Weekend Events in Miami, Florida in 2012, WWE again encountered numerous counterfeiters from various states selling bootleg merchandise.  In the course of enforcing an *ex parte* TRO and seizure order issued by the United States District Court for the Southern District of Florida, WWE seized hundreds of counterfeit shirts.  Most of

those shirts were child-sized and emitted a strong unknown chemical odor, which further increases and heightens the public safety concern.

27.    Importantly, two of the counterfeiters who were served in Miami, Florida in 2012 had been served previously at WrestleMania® 24 in Orlando, Florida in 2008 pursuant to an *ex parte* TRO and seizure order issued by the Honorable John Antoon II of this Court (Case No. 6:08-418).   In addition, as described in more detail below, two of the defendants who were served in Miami, Florida were also served years later in a different state entirely -- in New Orleans, Louisiana in 2014.  These facts establish Defendants complete disregard for the law and their intent to follow WWE Live Events around the United States.

28.    In 2013, at the WrestleMania® 29 Weekend Events in East Rutherford, New Jersey, WWE again encountered numerous counterfeiters from various states selling bootleg merchandise.  In the course of enforcing an *ex parte* TRO and seizure order issued by the United States District Court for the District of New Jersey, WWE seized thousands of counterfeit T-shirts, DVDs, action figures and posterboards.   WWE also obtained a consented to permanent injunction against one of the counterfeiters that WWE served in connection with the court's TRO and seizure order.

29.    Three years ago, WWE sought a TRO and Seizure Order from the United States District Court for the Eastern District of Louisiana in advance of the WrestleMania® 30 events in New Orleans, Louisiana.  The court denied WWE's request for an *ex parte* TRO and seizure order on the ground that WWE had not pleaded sufficient specific facts about the unknown counterfeiters' identities.  The Court of Appeals for the Fifth Circuit, however, found that the district court had abused its discretion and vacated that decision, rejected the district court's reasoning and held that WWE had established its entitlement to a TRO and Seizure Order.

11

30.     Because of the district court's ultimately vacated decision, WWE was forced to contend with counterfeiters at the WrestleMania® 30 events without the benefit of a TRO and seizure order.  WWE's ability to combat counterfeit sales was significantly hampered.

31.     By working with local law enforcement at the WrestleMania® 30 events, WWE was able to identify the putative names of four individuals who were caught selling counterfeit merchandise.  WWE was not able to obtain contact information for all four individuals, and the contact information it did obtain turned out to be false.

32.     Ultimately, WWE filed two amended Motions for TRO and Seizure Order against the four identified individuals.  Two of these individuals had been previously served in Miami in 2012 pursuant to an *ex parte* TRO and seizure order granted by the Southern District of Florida in connection with WrestleMania® 28.  The individuals did not participate in the Southern District of Florida proceeding and likewise failed to return process or enter an appearance in the Eastern District of Louisiana proceeding.

33.     In 2015, WWE obtained and enforced an *ex parte* TRO and seizure order issued by the United States District Court for the Northern District of California at the WrestleMania® 31 Weekend Events in San Jose and Santa Clara, California.  In connection with the Northern District of California's order, WWE was able to serve several counterfeiters and seized their counterfeit merchandise.  After the WrestleMania® 31 Weekend Events, WWE entered into a settlement agreement that permanently enjoined three of the counterfeiters that WWE served in connection with the court's TRO and seizure order.

34.     Last year, the United States District Court for the Northern District of Texas issued WWE an *ex parte* TRO and seizure order for WWE's WrestleMania® 32 Weekend Events in Dallas and Arlington, Texas.  With the assistance of local law enforcement, WWE was able to

obtain the names of several counterfeiters and obtained a permanent injunction against two of the counterfeiters that WWE served in connection with the court's TRO and seizure order.

35.     Since WWE's WrestleMania® 32 Weekend Events, WWE has continued to encounter counterfeiters at its Live Events.   For instance, on February 28, 2017, WWE encountered numerous counterfeiters at its WWE SmackDown® Live event held in St. Paul, Minnesota at the Xcel Energy Center.   These counterfeiters were selling "Road To WrestleMania®" shirts that displayed counterfeit WWE Marks and Superstars on the front and a list of WWE® Live events from January through March on the back, including listing the WrestleMania® 33 Weekend Events in Orlando.  Approximately two weeks later, WWE saw the identical counterfeit shirt being sold at a WWE live event in New York, New York.  And a few days later, WWE saw the identical counterfeit shirt being sold at a WWE live event in Detroit, Michigan.  In fact, one of the individuals selling this shirt in Detroit, Michigan had travelled to Detroit from New York.  Based on WWE's prior experience, WWE believes and asserts that Defendants have and will continue to sell this Counterfeit Merchandise and others like it across the United States.

36.     At no time has WWE authorized Defendants to manufacture, distribute, offer for sale or sell any Counterfeit Merchandise, nor any WWE Merchandise or goods or materials bearing the WWE Marks not specifically licensed and approved by WWE.

37.     As described more fully in the Declaration of Lauren Dienes-Middlen, Esq., which was filed concurrently with the Verified Complaint and is incorporated herein by reference, WWE has undertaken, and continues to undertake significant, extensive measures to guard against the unauthorized distribution and sale of Counterfeit Merchandise at live events.

38.     Based upon its investigation into the matter, and as described more fully in the Dienes-Middlen Declaration, WWE has observed that the design, materials and quality of most of the Counterfeit Merchandise being distributed and sold at WWE live events throughout the United States is poor and uniform from event to event and city to city.  As set forth above, WWE has encountered Counterfeit Merchandise that lists multiple WWE live events making it easy for such merchandise to be sold from venue to venue.  Based in part on this uniformity, WWE believes and asserts that Defendants who are distributing and selling Counterfeit Merchandise are part of a concerted operation that travels from venue to venue selling unauthorized Counterfeit Merchandise likely acquired from common sources of manufacture.  Many of the individual Defendants sell the same Counterfeit Merchandise in different cities.  Groups of these individuals travel together from event to event, including in the Middle District of Florida.

39.     Thus, without the aid of a federal court order authorizing seizure of Counterfeit Merchandise, WWE is unable to combat the network of individuals and entities distributing and selling unauthorized Counterfeit Merchandise at WWE's nationwide 2017-2018 Live Events and is effectively rendered unable to protect its rights, and the rights of the consuming public, against the unauthorized and unlawful distribution and sale of Counterfeit Merchandise at WWE's 2017-2018 Live Events.

40.     As demonstrated by the Dienes-Middlen Declaration, throughout the past several years of WWE live events, WWE has encountered numerous sellers of Counterfeit Merchandise at various locations throughout the United States.

41.     During the course of WWE's enforcement of TROs, Seizure Orders and nationwide preliminary injunctions entered by this Court as well as the Federal Courts of the Southern District of Texas, Southern District of Florida, Northern District of Georgia, District of

New Jersey, Northern District of California, and the Northern District of Texas, and prior similar orders, WWE seized thousands of counterfeit T-shirts, caps, wrestling face masks, posters, DVDs, pictures and other items of Counterfeit Merchandise marked with imitations of the WWE Marks.  As a result of WWE's ability to seize Counterfeit Merchandise, WWE was able to avoid hundreds of thousands of dollars in lost sales, as well as irreparable injury to WWE's reputation and goodwill with the consuming public.  In addition, as a result of WWE's ability to seize Counterfeit Merchandise, WWE was able to protect the safety of the public against potential harmful effects of such inferior and potentially dangerous goods.

42.     Pursuant to past TROs, Seizure Orders, and nationwide preliminary injunctions, WWE has posted a bond and proceeded at all times with the utmost caution in seizing only those goods that WWE's enforcement team determined to be Counterfeit Merchandise.  WWE enforced the TROs, Seizure Orders and nationwide preliminary injunctions in a manner designed to protect its trademarks and service marks without compromising the rights of the Defendants in those actions.

43.     Many of the individuals served under these prior TROs, Seizure Orders and nationwide preliminary injunctions refused to identify themselves, refused to accept service, or both.  In addition, with respect to those that do not accept service, many of them provide fake identification.  Moreover, not a single one of the Defendants in those actions came forward with objections to the court.  Such behavior is typical of counterfeiters who distribute and sell unauthorized merchandise at live entertainment events.

44.     The TROs, Seizure Orders and nationwide preliminary injunctions issued in the past enabled WWE to effectively police distribution and sale of Counterfeit Merchandise throughout WWE's nationwide series of live events, without incident.  The Defendants' conduct,

however, represents a continuing problem, not yet abated, and the only effective relief available to WWE is the *ex parte* seizure process.

45.     Without the ability to seize Counterfeit Merchandise at and near WWE's 2017-2018 Live Event venues, WWE stands to lose untold and irrecoverable sums in merchandise sales and suffer incalculable, irreparable damage to its reputation and goodwill in addition to the harm such counterfeiting will cause to the consuming public.  In addition, WWE will not be able to protect the safety of the public — the targeted children — against potential harmful effects of such inferior and potentially dangerous goods.

**C.     Counterfeiting At WrestleMania® 33 Weekend Events in the Orlando, Florida Area and Expected Counterfeiting Elsewhere**

46.     WWE's WrestleMania® 33 Weekend Events occurred from March 30, 2017 through April 4, 2017 and consisted of various events taking place in Orlando, Florida, including, but not limited to, (1) WWE's WrestleMania® Axxess event at the Orange County Convention Center from March 30 through April 2, 2017; (2)  WWE's WrestleMania® Hall of Fame Induction Ceremony event at the Amway Center on March 31; (3) WWE's NXT® TakeOver event at the Amway Center on April 1; (4) WWE's WrestleMania® 33 event at the Orlando Citrus Bowl (a/k/a Camping World Stadium) on April 2; (5) WWE's Monday Night Raw® event at the Amway Center on April 3; and (6) WWE's SmackDown® Live event on April 4 at the Amway Center (collectively, the "WrestleMania® 33 Weekend events").  After the WrestleMania® 33 Weekend Events, WWE's 2017-2018 Live Events will proceed throughout the United States according to the schedule attached hereto as Exhibit 3.

47.     In connection with its WrestleMania® 33 Weekend Events and its nationwide 2017-2018 Live Events, WWE has advertised and promoted heavily, and will continue to advertise and promote heavily, the WWE Marks in interstate commerce.

48.     As WWE's past experience has demonstrated, the only effective means of protecting WWE's trademarks and service marks from unlawful counterfeiting by Defendants at WWE's 2017-2018 Live Events is through the *ex parte* seizure process, which provides WWE with the ability to fight against unlawful counterfeiting.  To maintain any meaningful defense against the unlawful distribution and sale by Defendants of Counterfeit Merchandise at WWE's 2017-2018 Live Events, which is an ongoing problem inherent in the live-entertainment industry, WWE must be allowed to proceed with the *ex parte* seizure process.

49.     Indeed, Defendants are habitual "repeat offenders" who often refuse to identify themselves or accept service, much less appear in court in connection with the seizure of their unlawful goods.  Aware of the illegality of their activities, these individuals and groups, if caught, will quickly hide or dispose of their Counterfeit Merchandise, or load it into a waiting vehicle and lock the vehicle or drive it away.  Most sellers have only a small number of items at any given time and their supply is immediately replenished after being seized by WWE.  In fact, WWE has encountered this exact modus operandi consistently over the years.  Thus, Defendants are organized and acting in concert with one another and are making a conscious effort to hide their identities.

50.     Defendants are typically street peddlers, without offices, identification, licenses or addresses.  In this manner, they can avoid having to respond to an ordinary civil lawsuit and thus are essentially immune from an injunction unless it is accompanied by authority to seize Counterfeit Merchandise.

51.     For example, through the enforcement of *ex parte* TROs, Seizure Orders, and nationwide preliminary injunctions, WWE has attempted to serve hundreds of counterfeiters and has seized thousands of items of Counterfeit Merchandise.  Most of the apprehended

counterfeiters, who not only appeared at the venues where the event was occurring but also in the parking areas at the venues and on the roads that led to the venues, refused to identify themselves and refused to accept service, and none have contested their illegal activity in court. WWE would welcome their appearances in court, as it would permit WWE to identify the bootleggers, take discovery from them, discover their manufacturing and printing sources and pursue them for money damages.

52.     The Defendant bootleggers will continue, undaunted, to attempt to peddle Counterfeit Merchandise at WWE's 2017-2018 Live Events, and WWE's only means of keeping their conduct under control is through the *ex parte* seizure process.

53.     Based upon the foregoing, and based upon its experience enforcing earlier TROs, Seizure Orders and nationwide preliminary injunctions as explained in the Dienes-Middlen Declaration, WWE believes and therefore avers that Defendants will follow WWE's 2017-2018 Live Events from city to city, throughout the country, selling Counterfeit Merchandise. Defendants constitute bootlegging rings that operate in this District by obtaining Counterfeit Merchandise from a small number of manufacturers.

54.     On information and belief, the named and unnamed Defendants will continue to attempt to sell Counterfeit WWE Merchandise at WWE's 2017-2018 Live Events.

55.     *Ex parte* seizure relief is thus essential if WWE is to maintain a defense against and effectively police the unlawful activities of all Defendants at the nationwide series of WWE 2017-2018 Live Events. Without such relief, WWE will have no effective remedy against Defendants' continued distribution and sale of Counterfeit Merchandise that infringes WWE's registered and unregistered trademarks and service marks, threatens lost sales in untold dollars, deceives the consuming public into mistakenly believing they are purchasing authorized,

licensed, high quality goods, and poses a potential safety risk because of the inability for WWE to control the quality of the materials used by the bootleggers.

**D.    Irreparable Harm To WWE**

56.    Defendants' use of counterfeits of the WWE Marks on the Counterfeit Merchandise will deceive the consuming public into believing that they are purchasing genuine goods which have been manufactured, authorized, or approved by WWE, and will likely cause confusion and mistake in that consumers are likely to assume that WWE has manufactured, authorized, or approved the Counterfeit Merchandise sold by Defendants.

57.    In addition to causing WWE to suffer incalculable, irrecoverable, and irreparable lost sales, Defendants' manufacture, distribution, and sale of inferior quality Counterfeit Merchandise displaying the WWE Marks will irreparably injure WWE's reputation for the manufacture and sale of the highest quality souvenirs, merchandise, and memorabilia and poses a potential safety risk to the public because WWE is unable to control the quality of the materials used by the bootleggers.  Indeed, there is no way to know the quality of the counterfeit goods, such as the flammability level of the ink used to print the t-shirts and the safety of the design of other goods, such as wrestling face masks, that previously have been seized.  For example, counterfeit merchandise seized at prior WrestleMania® Weekend Events consisted of child-sized t-shirts and emitted a strong unknown chemical odor, which further increases and heightens the public safety concern.

58.    Based on WWE's prior encounters with sellers of Counterfeit Merchandise at live events, other WWE events, and in the retail and wholesale distribution context, on information and belief, WWE alleges that if injunctive relief, including a seizure order, were not granted, Defendants will cause the unauthorized Counterfeit Merchandise to be dispersed and, thereafter,

sold at other locations on or near the premises of the event arenas or elsewhere with the result that WWE will be unable to obtain an effective remedy for Defendants' wrongful conduct.

## COUNT I
### Trademark Infringement (Registered Marks)

59.     Plaintiff hereby re-alleges, as if fully set forth herein, paragraphs 1 through 58 of this Amended Complaint.

60.     The WWE Marks on WWE Merchandise have become well and favorably known to consumers throughout the United States, including Florida, as an indication of goods emanating from or authorized by a single source, *i.e.*, WWE.

61.     Defendants' use of counterfeits of the WWE Marks on the Counterfeit Merchandise constitutes infringement of WWE's registered trademarks in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114.

62.     The threat of the loss of WWE's right to control the use of its marks and the reputation of its goods is real and substantial.  This loss is further enhanced by the inferior quality of Defendants' Counterfeit Merchandise.

63.     Defendants' acts described herein will infringe the WWE Marks, will injure WWE's business, reputation, and goodwill, and unless restrained and enjoined will continue to do so, all to WWE's monetary damage and irreparable harm.

## COUNT II
### Trademark Infringement (Unregistered Marks) And False Designation Of Origin

64.     Plaintiff hereby re-alleges, as if fully set forth herein, paragraphs 1 through 58 of this Amended Complaint.

65.     Defendants' use of the WWE Marks on the Counterfeit Merchandise constitutes infringement of WWE's unregistered trademarks in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

66.     Defendants' use of the WWE Marks on the Counterfeit Merchandise creates a false designation of origin and a false representation of Defendants' goods, all in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

67.     The threat of the loss of WWE's right to control the use of its marks and the reputation of its goods is real and substantial.  This loss is further enhanced by the inferior quality of Defendants' Counterfeit Merchandise.

68.     Defendants' acts described herein will infringe the WWE Marks, will injure WWE's business, reputation, and goodwill, and unless restrained and enjoined, will continue to do so, all to WWE's monetary damage and irreparable harm.

## COUNT III
## Federal Trademark Dilution

69.     Plaintiff hereby re-alleges, as if fully set forth herein, paragraphs 1 through 58 of this Amended Complaint.

70.     As a result of the duration and extent of WWE's use and promotion of the WWE Marks, at least WWE®, WWE® logo, Raw®, Smackdown®, WrestleMania®, SummerSlam®, Royal Rumble®, Survivor Series® and names and likenesses of several of its current wrestlers are famous and highly distinctive.

71.     Defendants are making commercial use of these WWE marks in interstate commerce.

72.     Defendants' use began long after these WWE marks became famous.

73.     Defendants' use of these WWE marks dilutes the distinctive quality of the marks by diminishing the capacity of the marks to identify and distinguish WWE's goods and services, in violation of § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

74.     Defendants willfully intended to trade on WWE's reputation and goodwill, and to cause dilution of WWE's famous marks.

75.     Defendants' conduct has caused and continues to cause WWE immediate and irreparable injury.  WWE lacks an adequate remedy at law.

**COUNT IV**
**Trafficking In Counterfeit Goods**

76.     Plaintiff hereby re-alleges, as if fully set forth herein, paragraphs 1 through 58 of this Amended Complaint.

77.     Defendants' souvenirs, merchandise, and memorabilia constitute goods bearing counterfeit marks.  Defendants have trafficked these goods in violation of the Trademark Counterfeiting Act of 1984, 15 U.S.C. § 1116(d) and unless restrained and enjoined, will continue to traffic these goods, all to WWE's monetary damage and irreparable harm.

**COUNT V**
**Trademark Infringement and**
**Unfair Competition, Under Florida Law**

78.     Plaintiff hereby re-alleges, as if fully set forth herein, paragraphs 1 through 58 of this Amended Complaint.

79.     The WWE Marks are marks valid at common law.

80.     Defendants' unauthorized use of the WWE Marks is likely to cause confusion, or mistake or to deceive as to the source of Defendants' goods and services, which constitutes trademark infringement and dilution under Florida law.

81.     Defendants' unauthorized use of the WWE Marks constitutes trademark infringement, trademark dilution and unfair competition under Florida common law and Fla. Stat. §§ 495.131, 495.151, and 501.204.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff World Wrestling Entertainment, Inc. respectfully prays:

1.    That this Court grant a preliminary and permanent injunction enjoining Defendants and each of his, her, or their partners, associates, agents, servants, and employees, and all other bootleggers acting in concert therewith or having knowledge thereof, from manufacturing, distributing, offering for sale or selling Counterfeit Merchandise, or any other souvenirs, merchandise, or memorabilia bearing any of the WWE Marks or any other mark, word, or name similar to the WWE Marks in a manner which is likely to cause confusion or mistake or to deceive.

2.    That this Court order that (a) all Counterfeit Merchandise, or any other souvenirs, merchandise, or memorabilia referring to or bearing any of the WWE Marks or any confusingly similar marks and (b) records documenting the manufacture, sale, or receipt of things involved in the sale, offering for sale, or distribution of Counterfeit Merchandise, found in the possession, custody, or control of Defendants be seized until a hearing can be held before this Court to determine the disposition of any goods so seized.

3.    That this Court order that (a) all Counterfeit Merchandise, or any other souvenirs, merchandise, or memorabilia bearing any of the WWE Marks or any confusingly similar marks, and all plates, molds, matrices, and other means of making the same, found in the possession, custody, or control of Defendants, and (b) any goods seized pursuant to this Court's order shall be delivered up to WWE, WWE's agents, or WWE's attorneys pending the outcome of this action.

4.    That Defendants be required to account to and reimburse WWE for any and all profits which Defendants have derived from the sale of any Counterfeit Merchandise or any other souvenirs, merchandise, or memorabilia bearing any of the WWE Marks or any

confusingly similar marks, and for any and all damages which WWE has sustained by reason of the acts complained of herein, or statutory damages.

5.      That Defendants be required to pay treble the amount of any profits derived from the sale of any Counterfeit Merchandise.

6.      That this Court award WWE its cost and reasonable attorneys' fees in this action.

7.      That this Court grant such other and further relief as it deems just and appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff World Wrestling Entertainment, Inc. hereby demands a trial by jury of all issues so triable.

Dated:   April 7, 2017                          Respectfully submitted,

                                        /s/ Jonathan B. Morton
                                        Jonathan B. Morton
                                        Lead Trial Counsel
                                        Florida Bar No.: 956872
                                        jonathan.morton@klgates.com
                                        K & L Gates LLP
                                        200 S Biscayne Blvd Ste. 3900
                                        Miami, FL 33131
                                        Tel: 305 539 3300
                                        Fax: 305 358 7095
                                        *Attorneys for Plaintiff, World Wrestling Entertainment, Inc.*

                                        Jerry S. McDevitt (pro hac vice forthcoming)
                                        Email: jerry.mcdevitt@klgates.com
                                        Curtis B. Krasik (pro hac vice forthcoming)
                                        Email: curtis.krasik@klgates.com
                                        Christopher M. Verdini (admitted pro hac vice)
                                        Email: christopher.verdini@klgates.com
                                        K&L Gates LLP
                                        K&L Gates Center
                                        210 Sixth Avenue
                                        Pittsburgh, Pennsylvania 15222
                                        Telephone: (412) 355-6500  Facsimile: (412) 355-6501

24